**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| ALIXPARTNERS, LLP,<br>ALIXPARTNERS HOLDINGS, LLP,<br>and ALIXPARTNERS S.R.L., | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 2019-0392-KSJM |
| | ) | |
| GIACOMO MORI, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

Date Submitted: August 28, 2019
Date Decided: November 26, 2019

Bradley R. Aronstam, Eric D. Selden, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Nicholas J. Pappas, Robert S. Berezin, Justin Michael DiGennaro, WEIL, GOTSHAL & MANGES LLP, New York, New York; *Counsel for Plaintiffs AlixPartners, LLP, AlixPartners Holdings, LLP, and AlixPartners S.r.l.*

John A. Sensing, Clarissa R. Chenoweth, Jesse L. Noa, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Counsel for Defendant Giacomo Mori.*

**McCORMICK, V.C.**

The plaintiffs operate a global business advisory firm known as AlixPartners. The defendant was the managing director of the plaintiffs' office in Milan, Italy. Over the course of his employment, the defendant received compensation in the form of equity interests in two New York-based AlixPartners affiliates formed under Delaware law, Plaintiffs AlixPartners, LLP ("Alix") and AlixPartners Holdings, LLP ("Alix Holdings"). Two agreements with the Delaware entities governed the defendant's equity awards: a limited liability partnership agreement and an equityholders' agreement. Those agreements contain Delaware choice of law and forum selection provisions. A separate agreement with the defendant's Italian employer, Plaintiff AlixPartners S.r.l. ("Alix S.r.l."), governed the defendant's employment. The employment agreement contains an Italian choice of law provision but no forum selection clause.

In 2018, Alix S.r.l. raised concerns regarding the defendant's alleged violations of firm policy. Anticipating his termination, the defendant connected a personal external data storage device to his work-issued computer and downloaded files alleged to be the confidential and proprietary information of all three plaintiffs. When the defendant refused to return or destroy the information, the plaintiffs commenced this litigation, claiming that the defendant breached a host of confidentiality and other contractual obligations under the limited liability partnership agreement, equityholders' agreement, and employment agreement. The

1

plaintiffs also asserted claims for misappropriation of trade secrets, conversion, and declaratory relief.

The defendant has moved to dismiss the complaint on several grounds, including lack of subject matter jurisdiction, lack of personal jurisdiction, improper venue, and failure to state a claim. The defendant's primary argument is that a European Union regulation and an Italian procedural law require Italian employers to bring proceedings concerning all employment-related disputes exclusively in Italian courts, thus divesting this Court of subject matter jurisdiction. This decision rejects that argument in light of the transitory nature of the plaintiffs' claims. This decision further rejects the defendant's arguments that Delaware forum selection provisions in the limited liability partnership and equityholders' agreements are unenforceable and concludes that these provisions are sufficient to establish personal jurisdiction over the defendant. This decision further concludes that the complaint adequately states multiple claims. Under the *forum non conveniens* doctrine, however, this decision stays certain of the plaintiffs' claims that arise exclusively from the employment agreement and are governed by Italian law.

## I.    FACTUAL BACKGROUND

These facts are drawn from the Verified Complaint ("Complaint") and the documents it incorporates by reference.[1]

---

[1] C.A. No. 2019-0392-KSJM, Docket ("Dkt.") 1, Verified Compl. ("Compl.").

## A. The Parties

Alix and Alix Holdings are Delaware limited liability partnerships with principal places of business in New York. Alix S.r.l. is an Italian subsidiary of Alix (with Alix and Alix Holdings, "AlixPartners"). AlixPartners is a leading global business advisory firm that specializes in turnaround and restructuring and provides consulting services ranging from enterprise improvement to information management.

Defendant Giacomo Mori ("Defendant") joined the Milan office of Alix S.r.l. as a director in September 2003. In January 2014, Alix S.r.l. promoted Defendant to managing director. In March 2017, Defendant was made a partner in Alix Holdings. In his various positions, Defendant was responsible for building and maintaining client relationships, leading complex engagements, recruiting, and developing intellectual property for the firm. In carrying out these responsibilities, Defendant had access to AlixPartners' confidential and proprietary information.

## B. The Governing Agreements

Over the course of his employment, Defendant entered into various agreements with the AlixPartners entities. In January 2014, upon his promotion to managing director, Defendant entered into an employment agreement (the "Employment Agreement") with Alix S.r.l.[2] In March 2017, upon his promotion to

---

[2] *Id.* Ex. C.

partner, defendant executed a joinder adopting and approving Alix Holdings' then-operative LLP Agreement (the "LLP Agreement").[3]

As part of his compensation package, Defendant received equity awards governed by a series of option award agreements (collectively, the "Award Agreements").[4]  In 2014 and 2016, he entered into two Award Agreements with Alix Holdings (the "2014 Agreement" and the "2016 Agreement," respectively).[5]  According to the Complaint, those agreements are governed by an equityholders' agreement (the "Equityholders' Agreement").[6]  In February 2017, April 2017, and April 2018, Defendant entered into four more Award Agreements with Alix Holdings (the "February 2017 Agreements," the "April 2017 Agreement," and the "April 2018 Agreement," respectively).[7]  According to the Complaint, those agreements are governed by the Alix Holdings' 2017 LLP Interest and Option Plan (the "2017 Plan").[8]

---

[3] *Id.* Ex. A; *id.* ¶ 23 n.1.

[4] *Id.* ¶¶ 46–47, 52–54.

[5] *Id.* Exs. D, E.

[6] *Id.* ¶ 48; *id.* Ex. B.  The 2014 Agreement and 2016 Agreement state that they are governed by the AlixPartners Holdings, LLP 2012 LLP Interest and Option Plan, which is neither referenced in nor included as an exhibit to the Complaint.  *Id.* Exs. D, E, at 1.  Nonetheless, Plaintiffs allege that the 2014 Agreement and 2016 Agreement are ultimately subject to the Equityholders' Agreement—and Defendant does not refute this point.

[7] *Id.* Exs. F, G, H, I.

[8] *Id.* ¶ 48; *id.* Ex. J.  In their request for declaratory judgment, Plaintiffs state that Defendant also disputes that the 2017 Plan governs the February 2017, April 2017, and April 2018 Agreements.  *Id.* ¶ 95.  However, Defendant again does not offer a competing interpretation

Certain of the governing agreements contain contractual provisions that form the bases for the claims in this litigation. The Employment Agreement and the LLP Agreement contain provisions restricting Defendant's use of confidential information.[9] The Employment Agreement contains a provision requiring the return of confidential materials upon termination (the "Return of Property Provision")[10] and a provision requiring Defendant to use his "best efforts" to promote Alix S.r.l.'s services, business, and affairs (the "Best Efforts Provision").[11]

The Employment Agreement and Award Agreements contain nearly identical provisions restricting Defendant's ability to solicit AlixPartners' business or managing directors post-termination. The Employment Agreement contains a one-year non-solicitation provision,[12] and each of the Award Agreements contains a two-year non-solicitation provision.[13]

---

in his briefs. Plaintiffs' interpretation is at least reasonably conceivable, because each of the February 2017, April 2017, and April 2018 Agreements contains a provision subjecting the option awards they grant "to the terms and conditions of the Plan [defined as the 2017 Plan]." *Id.* Exs. F, G, H, I §§ 1. The Court accepts this conclusion for purposes of its analysis.

[9] Employment Agreement at 5–6; LLP Agreement § 15.3.

[10] Employment Agreement at 7.

[11] *Id.* at 1.

[12] *Id.* at 4–5.

[13] Compl. Exs. D, E, F, G, H, I §§ 8(b). This is a slight oversimplification, in light of the complex contractual scheme involved in this case. As discussed below, the non-solicitation provisions in certain of the Award Agreements may be arguably open-ended in duration. *See infra* notes 171–72 and accompanying text.

All of the agreements entered into by the parties—except the Employment Agreement—either contain or are subject to Delaware forum selection and Delaware choice of law provisions. The LLP Agreement and Equityholders' Agreement each contain Delaware forum selection[14] and Delaware choice of law[15] provisions. The Equityholders' Agreement's Delaware forum selection and Delaware choice of law provisions apply to the 2014 and 2016 Agreements.[16] The Award Agreements executed pursuant to the 2017 Plan—the February 2017, April 2017, and April 2018 Agreements—are subject to the LLP Agreement's Delaware forum selection provision,[17] and each contains its own Delaware choice of law provision.[18] The Employment Agreement does not contain a forum selection clause, but it contains an Italian choice of law provision.[19]

## C.    AlixPartners S.r.l. Terminates Defendant's Employment.

On April 2, 2019, Alix S.r.l. notified Defendant by letter that he allegedly violated numerous firm policies. Ten days later, Defendant responded by letter

---

[14] LLP Agreement § 15.9; Equityholders' Agreement § 5.8.

[15] LLP Agreement § 15.8; Equityholders' Agreement § 5.7.

[16] Compl. ¶ 48; *id.* Exs. D, E §§ 15; *see supra* note 6 and accompanying text.

[17] Compl. ¶ 55. The 2017 Plan does not contain a Delaware forum selection clause, but equity awards granted thereunder are subject to the terms and conditions of the LLP Agreement, the Equityholders' Agreement, and the applicable Award Agreement. 2017 Plan § 6(a).

[18] Compl. Exs. F, G, H, I §§ 15. The 2017 Plan also has its own Delaware choice of law provision. 2017 Plan § 13(a).

[19] Employment Agreement at 8.

6

explaining his position. On May 10, 2019, Alix S.r.l. replied that it had confirmed Defendant's alleged failure to follow relevant procedures and explained that such failure constituted a breach of trust requiring his termination. Defendant's employment was terminated that same day.

## D. Defendant Accesses AlixPartners' Confidential Information.

On May 9, 2019—one day before the termination—Defendant connected a personal external data storage device to his work-issued computer and copied to that device more than 3,000 documents designated "Confidential" or "High Risk" by the AlixPartners U.S.-based data loss prevention system.[20] These documents included a directory containing at least 1,500 user-created files whose paths contained client names. AlixPartners' additional U.S.-based data protection system revealed that at least 22,000 items—including email, Excel documents, Word documents, PowerPoint presentations, and PDFs—were copied to the same external device on the same date. Based on the file names, the majority of these items "appear to be AlixPartners data."[21] The documents Defendant copied to the external device included presentations related to Defendant's work on behalf of AlixPartners, reports, revenue assessments, studies prepared by AlixPartners, notes from meetings, pricing analyses, and other strategic documents appearing to contain

---

[20] Compl. ¶¶ 26, 27, 30–31.

[21] *Id.* ¶ 36.

"confidential and sensitive" information and "valuable trade secrets" relating to the company's methods, techniques, and processes for conducting and marketing its consulting business.[22]

On May 13, 2019, AlixPartners sent a letter to Defendant notifying him that the company was aware that he had downloaded a large number of files onto an external storage device. The letter directed Defendant to return, delete, or destroy those files. On May 14, 2019, Defendant returned certain AlixPartners' property, including his work-issued laptop, to the company's Milan office. Defendant did not produce the external storage device. Defendant represented at that time that he had copied only personal files from his work-issued laptop.

On May 19, 2019, Defendant explained to a senior AlixPartners executive that he had in fact downloaded personal files, old files for references, and files regarding an AlixPartners client engagement. The Complaint describes this explanation as an admission that Defendant had "downloaded a number of confidential files from his AlixPartners' laptop."[23] At no point did Defendant return to AlixPartners the external storage device or the information he copied to that device. Defendant has also declined to certify that he has returned, deleted, or destroyed the documents.

---

[22] *Id.* ¶¶ 38–39.

[23] *Id.* ¶ 44.

### E. Alix Holdings Determines Defendant's Leaver Status.

Defendant's termination under the Employment Agreement had potential knock-on effects under the agreements governing his equity awards.

Under the Equityholders' Agreement, Alix Holdings has the right to repurchase a separating managing director's equity interests depending on the managing director's leaver status. If the Alix Holdings board determines that the managing director is a "Bad Leaver,"[24] then Alix Holdings may repurchase the managing director's equity interests at a price equal to the lesser of (i) their fair market value at the time they were granted, or (ii) their fair market value at the time of the repurchase.[25] Upon Defendant's termination, the Alix Holdings board determined that Defendant was a "Bad Leaver" and decided to repurchase his equity interests under the 2014 Agreement and the 2016 Agreement.

Under the 2017 Plan, a separating managing director's equity interests automatically terminate depending on the managing director's leaver status. If the Alix Holdings board determines that the managing director is a "Non-Qualified Leaver,"[26] then the managing director's options "shall immediately terminate as of

---

[24] The Equityholders' Agreement defines the term "Bad Leaver" in § 1.1(a).

[25] Equityholders' Agreement § 4.1(c).

[26] The 2017 Plan provides that the AlixPartners Equity Exchange (the "APEX") defines "Non-Qualified" Leaver. *Id.* § 2(y). The APEX is attached to the Complaint as Exhibit K and defines "Non-Qualified Leaver" in § 2(w). Compl. Ex. K § 2(w).

the date such [managing director] becomes a Non-Qualified Leaver."[27] Upon Defendant's termination, the Alix Holdings board determined that Defendant was a "Non-Qualified Leaver" within the meaning of the 2017 Plan. Defendant's options under the February 2017 Agreements, the April 2017 Agreement, and the April 2018 Agreement thus immediately terminated as of the date of Defendant's termination.

## F. This Litigation

Plaintiffs commenced this litigation on May 28, 2019. The Verified Complaint asserts six counts:

- Count I for breach of the Employment Agreement's confidentiality provision, Return of Property Provision, and Best Efforts Provision brought by Alix S.r.l.;[28]

- Count II for breach of the LLP Agreement's confidentiality provision brought by Alix Holdings;[29]

- Count III for misappropriation of trade secrets brought by all three Plaintiffs;

- Count IV for conversion brought by all three Plaintiffs;

- Count V for a declaratory judgment as to AlixPartners' contractual right to repurchase or terminate Defendant's equity brought by all three Plaintiffs; and

---

[27] Compl. ¶ 56; 2017 Plan § 5(e).

[28] Plaintiffs clarified in briefing that although AlixPartners pled Count I for breach of the Employment Agreement broadly on behalf of all three Plaintiffs, only Alix S.r.l asserts that Count. Dkt. 15, Pls.' Answering Br. in Opp'n to Def.'s Mot. to Dismiss and to Vacate Stipulation and Order for Status Quo ("Pls.' Answering Br.") at 14.

[29] Plaintiffs also clarified in briefing that although AlixPartners pled Count II for breach of the LLP Agreement broadly on behalf of all three Plaintiffs, only Alix Holdings asserts that Count. *Id.* at 14 n.6.

10

- Count VI for a declaratory judgment concerning Defendant's contractual non-solicitation obligations brought by all three Plaintiffs.

Defendant moved to dismiss the Complaint. The parties fully briefed the motion,[30] and the Court heard oral arguments on August 28, 2019.[31]

## II. LEGAL ANALYSIS

Defendants have moved to dismiss the Complaint under Court of Chancery Rules 12(b)(1) for lack of subject matter jurisdiction and lack of standing, 12(b)(2) for lack of personal jurisdiction, 12(b)(3) for improper venue, and 12(b)(6) for failure to state a claim.

### A. The Court Has Subject Matter Jurisdiction.

Defendant's first argument is that the Court lacks subject matter jurisdiction over this dispute.[32] Defendant does not dispute that certain of the claims in this case

---

[30] Dkt. 9, Def.'s Mot. to Dismiss and to Vacate Stipulation and Order for Status Quo ("Def.'s Opening Br."); Pls.' Answering Br.; Dkt. 19, Def.'s Reply Br. in Supp. of Mot. to Dismiss and to Vacate Stipulation and Order for Status Quo ("Def.'s Reply Br.").

[31] Contemporaneously with the Complaint, Plaintiffs filed a motion for a temporary restraining order. Dkt. 1, Mot. for a TRO. To resolve that motion, the parties negotiated a Stipulation and Proposed Status Quo Order, which the Court entered on June 5, 2019 (the "Status Quo Order"). Dkt. 8, Stipulation and Order for Status Quo. In the Status Quo Order, Defendant agreed to relinquish custody of the external storage device to his counsel, who would then arrange for forensic imaging of the device and deliver the forensic image to Plaintiffs' counsel. *Id.* ¶¶ 2–5. With the motion to dismiss, Defendant also moved to vacate the Status Quo Order, which the Court addresses separately. Def.'s Opening Br. at 43–44.

[32] Def.'s Opening Br. at 8–16.

11

fall within the Court's traditional subject matter jurisdiction;[33] nor could he.[34]

Rather, Defendant argues that two foreign laws divest the Court of subject matter jurisdiction: a European Union ("EU") regulation enforceable as law in all EU member states including Italy and a provision of the Italian Civil and Labour Procedure Code.[35]

The EU regulation on which Defendant relies, referred to as the "Brussels Regulation," is a jurisdictional rule promulgated by the EU in order to ensure "judicial cooperation in civil matters which are necessary for the sound operation of the internal market."[36] It resolves "certain differences between national rules governing jurisdiction and recognition of judgments" by "unify[ing]" those rules "with a view to rapid and simple recognition and enforcement of judgments from

---

[33] "As Delaware's Constitutional court of equity, the Court of Chancery can acquire subject matter jurisdiction over a cause in only three ways, namely, if: (1) one or more of the plaintiff's claims for relief is equitable in character, (2) the plaintiff requests relief that is equitable in nature, or (3) subject matter jurisdiction is conferred by statute." *Candlewood Timber Gp., LLC v. Pan Am. Energy, LLC*, 859 A.2d 989, 997 (Del. 2004) (citing 10 *Del. C.* §§ 341, 342).

[34] Among other things, Plaintiffs seek equitable relief by asking this Court to enjoin Defendant from a variety of conduct related to the confidential and proprietary information in his possession and order the return of such information. Compl. Prayer for Relief ¶¶ b, c, d, f. As to the remaining claims and requests for relief, the Court may exercise equitable "clean-up" jurisdiction. *See* Donald J. Wolfe, Jr. & Michael A. Pittenger, Corporate and Commercial Practice in the Delaware Court of Chancery § 2.04 (2d ed. 2018) (providing an overview of equitable "clean-up" jurisdiction).

[35] Def.'s Opening Br. at 9–16.

[36] Dkt. 9, Transmittal Aff. of John A. Sensing in Supp. of Def.'s Mot. to Dismiss Ex. 4, at 1.

Member States."[37]   It requires employers, "[i]n matters relating to individual contracts of employment," to "bring proceedings only in the courts of the Member State in which the employee is domiciled."[38]

The Italian law on which Defendant relies is Article 413 of the Italian Civil and Labor Procedure Code ("Article 413").   According to Defendant's expert, Article 413 provides that disputes involving an Italian citizen's employment and employment relationship belong solely to the jurisdiction of the Italian Labour Judge.[39]

The laws of a foreign country cannot unilaterally deprive an American court of the power to hear a dispute.[40]   Delaware courts are "capable of adjudicating

---

[37] *Id.*

[38] *Id.* at ch. 2 § 5, arts. 18, 20.

[39] Dkt. 9, Decl. of Luca Failla Pursuant to 10 *Del. C.* § 3927 ¶ 11 ("Failla Decl."). Throughout briefing, Defendant also refers Article 414 of the Italian Civil and Labor Procedure Code ("Article 414").  Defendant does not assert that Article 414 divests the Court of subject matter jurisdiction; instead, he argues that it works in tandem with a provision of the Italian Constitution to invalidate the confidentiality provisions of the various agreements involved in this case.  The Court addresses this argument below in the analysis of whether Plaintiffs have stated a claim under Rule 12(b)(6).  *See infra* note 147 and accompanying text.

[40] *See Randall v. Arabian Am. Oil Co.*, 778 F.2d 1146, 1150 (5th Cir. 1985) ("We reject outright the notion that the law of a foreign country can unilaterally curtail the power of our federal courts to hear a dispute even though the dispute involves rights fixed by the laws of another nation."); *see also Reservoir 2020, Inc. v. Paulsson*, 785 F.3d 330, 335 (9th Cir. 2015) (quoting *Randall*, 778 F.2d at 1150); *Flame S.A. v. Freight Bulk Pte., Ltd.*, 762 F.3d 352, 366 (4th Cir. 2014) ("[F]oreign law . . . cannot determine the subject matter jurisdiction of an American court.") (Wilkinson, J., concurring).

13

[equitable] rights and remedies under the laws of foreign jurisdictions."[41] There are only "limited circumstances" in which Delaware courts "will *not* exercise subject matter jurisdiction over a dispute that is predicated on foreign law where the foreign state has vested jurisdiction exclusively in its own courts."[42] Defendant bears the burden of persuading the Court that foreign law divests this Court of an otherwise appropriate exercise of subject matter jurisdiction.[43]

Two decisions of the Delaware Supreme Court establish the limited circumstances in which a foreign country's exclusive jurisdiction statute will divest a Delaware court of subject matter jurisdiction: *Taylor*[44] and *Candlewood*.[45]

In *Taylor*, a Canadian company's minority stockholder sought to enjoin preliminarily the majority stockholder, a Delaware entity, from acquiring the minority interest.[46] The plaintiff's claim derived solely from the so-called "oppression remedy" conferred by the Canada Business Corporations Act.[47] The defendant moved to dismiss, arguing that the Canada Business Corporations Act

---

[41] *de Adler v. Upper N.Y. Inv. Co.*, 2013 WL 5874645, at *8 (Del. Ch. Oct. 31, 2013).

[42] *Candlewood*, 859 A.2d at 1004 (emphasis added).

[43] *Id.* ("On the question of whether exclusive jurisdiction has been vested in [another country's] courts . . . the proponent of that contention[] has the burden of persuasion.").

[44] *Taylor v. LSI Logic Corp.*, 715 A.2d 837 (Del. 1998), *overruled on other grounds by Martinez v. E.I. du Pont de Nemours & Co.*, 86 A.3d 1102 (Del. 2014).

[45] *Candlewood Timber Gp., LLC v. Pan Am. Energy, LLC*, 859 A.2d 989 (Del. 2004).

[46] 715 A.2d at 838.

[47] *Id.* at 839.

14

required the plaintiff to file suit in the courts of Canada.[48]  After considering relevant

legislative intent,[49] the Delaware Supreme Court held that the plaintiff's "exclusive

equitable remedy under . . . the Canada Business Corporations Act for oppressive

corporate acts lies in the courts of Canada."[50]  The Delaware Court of Chancery thus

lacked subject matter jurisdiction over the dispute.[51]

Six years after *Taylor*, the Delaware Supreme Court again considered the

effect of a foreign nation's exclusive jurisdiction statute in *Candlewood*.  In that

case, a Delaware entity's wholly owned Argentine subsidiary purchased a large plot

of forested land in Argentina for purposes of manufacturing and selling wood

products.[52]  The Delaware entity, Candlewood, agreed through its subsidiary to

allow the defendant—a Delaware LLC—to extract the oil and gas from the forested

land.[53]  Thereafter, the defendant's drilling program caused "massive" property

damage, and Candlewood filed a lawsuit in this Court alleging breach of contract,

negligence, fraud, tortious infringement of property rights, and tortious interference

with business relations.[54]  The defendant moved to dismiss the complaint, arguing

---

[48] *Id.*

[49] *Id.* at 840.

[50] *Id.* at 841.

[51] *Id.*

[52] *Candlewood*, 859 A.2d at 991.

[53] *Id.* at 991–92.

[54] *Id.* at 992.

15

among other things that Argentine law vested jurisdiction exclusively in Argentine courts.[55]

On appeal, the Delaware Supreme Court affirmed the Court of Chancery's decision rejecting the defendant's argument. The Court found that the plaintiffs' claims were transitory in nature and thus subject to the jurisdiction of the Delaware courts. In its analysis, the *Candlewood* Court adopted the test set forth by the Supreme Court of the United States in *Tennessee Coal, Iron & R.R. Co. v. George*.[56] In *Tennessee Coal*, a locomotive engineer suffered an injury while repairing brakes in Alabama.[57] The engineer sued his employer in a Georgia state court, asserting claims under an Alabama statute.[58] That Alabama statute provided for employer liability, but it also required the plaintiffs to seek relief in Alabama courts.[59] The Court found that the plaintiff's claims were transitory in nature because "the place of bringing suit [was] not part of the cause of action[]—the right and the remedy [were] not so inseparably united as to make the right dependent upon its being enforced in a particular tribunal."[60] The Court reasoned:

---

[55] *Id.* at 1004.

[56] *Id.* at 1006 (citing *Tenn. Coal, Iron & R.R. Co. v. George*, 233 U.S. 354 (1914)).

[57] *Tenn. Coal*, 233 U.S. at 358.

[58] *Id.* at 358.

[59] *Id.*

[60] *Id.* at 359.

16

> [A] state cannot create a transitory cause of action and at the same time destroy the right to sue on that transitory cause of action in any court having jurisdiction. That jurisdiction is to be determined by the law of the court's creation and cannot be defeated by the extraterritorial operation of a statute of another State, even though it created the right of action.[61]

Although *Tennessee Coal* involved the application of another U.S. state's law and thus was rooted in the Full Faith and Credit Clause, federal courts have since applied *Tennessee Coal*'s reasoning in order to determine the extraterritorial operation of the law of a foreign nation.[62]

The Delaware Supreme Court followed suit in *Candlewood*, applying the *Tennessee Coal* test to determine the extraterritorial operation of Argentine law. The Court observed that Candlewood's contract and tort claims were transitory in nature, and that they were thus properly brought in Delaware under *Tennessee Coal*.[63] The *Candlewood* Court distinguished *Taylor*, reasoning that in that case, "the general rule of *Tennessee Coal* did not apply, because 'the oppression remedy in [the Canada Business Corporations Act] [was] purely a legislatively created statutory remedy,' and 'it was the intent of the [Canadian] Parliament that actions brought under . . . the

---

[61] *Id.* at 360.

[62] *See, e.g.*, *Randall*, 778 F.2d at 1153 ("[I]f the Full Faith and Credit Clause of the United States Constitution, which is the Supreme Law of land, does not compel one state from recognizing the exclusive jurisdiction provisions of a sister state, then we see little or no reason why in a transnational case such as this, where no higher positive law binds us, we should be compelled to give effect to a foreign state's exclusive jurisdiction provision.").

[63] *Candlewood*, 859 A.2d at 1006–07.

17

Canada Business Corporations Act be brought only in the courts of Canada.'"[64] By contrast, the plaintiffs in *Candlewood* were "asserting claims arising under common law, not under an Argentine statute that purports to localize those claims exclusively within the Argentine court system."[65] And in *Candlewood* "the plaintiffs' causes of action [were] not (as was found to be the case in *Taylor*) so inseparably intertwined with a statutorily-created remedy that the right [could] be enforced only in the statutorily-mandated tribunal."[66]

In its analysis, the *Candlewood* Court also discussed with approval the Fifth Circuit's holding in *Randall*.[67] In that case, the former employee of a Delaware corporation whose tenure took place in Saudi Arabia filed suit in a federal court challenging his termination.[68] The defendant moved to dismiss on the ground that a Saudi Arabian labor law gave exclusive jurisdiction over labor disputes to a Saudi Arabian labor commission.[69] The Fifth Circuit rejected the defendant's argument, describing the plaintiff's claim as "a classic example of a transitory cause of action

---

[64] *Id.* at 1007 (quoting *Taylor*, 715 A.2d at 840 n.13, 841).

[65] *Id.*

[66] *Id.*

[67] *Randall v. Arabian Am. Oil Co.*, 778 F.2d 1146 (5th Cir. 1985).

[68] *Id.* at 1148.

[69] *Id.* at 1149.

that may be enforced in any foreign court having subject matter and *in personam* jurisdiction."[70]

Applying *Candlewood*'s analytical framework to this case, Defendant's subject matter jurisdiction arguments fail because the rights and remedies at issue are transitory in nature in that they "are not so inseparably united as to make the right[s] dependent upon [their] being enforced in a particular tribunal."[71] A comparison of this case with *Candlewood* and its progenitor decisions reinforces this conclusion.

Unlike *Taylor*, where a Canadian statute was the only source for the plaintiff's recovery, neither the Brussels Regulation nor Article 413 creates the rights or the remedies at issue in this case. As Defendant explains, the Brussels Regulation did not create enforceable substantive rights; it merely "codified the jurisdictional rules for the EU."[72] Similarly, Article 413 serves a *procedural* function rather than a substantive one in that it vests jurisdiction over employment disputes in the Italian Labour Judge.[73] Defendant does not argue that the Brussels Regulation or Article 413 creates the substantive rights or remedies that form the basis for the Complaint.

---

[70] *Id.* at 1151.

[71] *Tenn. Coal*, 233 U.S. at 359.

[72] Def.'s Opening Br. at 9.

[73] *Id.* at 10.

Like in *Candlewood* and *Randall*, Plaintiffs assert "claims arising under common law," not under an EU or Italian law that "purports to localize those claims exclusively within the [Italian] court system."[74]  Plaintiffs assert two counts for breach of contract, one count for misappropriation of trade secrets, and one count for conversion.[75]  As *Candlewood* explains, "[n]o contemporary legal order's law of contract or tort seeks to localize . . . actions sounding in tort or contract."[76]  And as a general matter, "[m]ost types of actions are considered transitory."[77]  The common law rights Plaintiffs seek to enforce are not the sort of statutorily-created rights so "inseparably united" with statutorily-created remedies that they must be enforced in a "particular tribunal."[78]  The Brussels Regulation and Article 413 thus do not divest this Court of subject matter jurisdiction.

This conclusion is particularly appropriate given that the claims in this case relate to the internal affairs of Alix Holdings, a Delaware limited liability partnership.[79]  Plaintiffs' claims that Defendant violated confidentiality obligations to his employer under the Employment Agreement overlap significantly with claims

---

[74] *Candlewood*, 859 A.2d at 1007; *see Randall*, 778 F.2d at 1151.

[75] Compl. Counts I, II, III, IV.

[76] *Candlewood*, 859 A.2d at 1006 (citation omitted).

[77] *Id.* (quoting Moore's Federal Practice ¶ 110.20[2] (3d ed. 2002)).

[78] *Tenn. Coal*, 233 U.S. at 359.

[79] Compl. ¶ 5.

20

arising out of the LLP Agreement. "[T]he logic of the internal affairs doctrine, developed in regard to corporations, applies with equal force in the context of a partnership."[80] That doctrine "is a long-standing choice of law principle which recognizes that only one state should have the authority to regulate corporation's internal affairs—the state of incorporation."[81] Plaintiffs' claims involve matters peculiar to Alix Holdings that pertain to the relationship between that entity and one of its partners—Defendant.[82] Delaware thus has a vested policy interest in providing a forum for the adjudication of claims under the LLP Agreement.

## B. Alix and Alix Holdings Have Standing to Pursue Their Claims.

Defendant next argues that Alix and AlixHoldings lack standing to pursue Plaintiffs' claims for breach of the confidentiality provisions of the LLP Agreement, misappropriation, and conversion.[83] To establish standing under Delaware law, a plaintiff bears the burden of pleading each of the elements of standing, including

---

[80] *Total Hldgs. USA, Inc. v. Curran Composites, Inc.*, 999 A.2d 873, 884 (Del. Ch. 2009).

[81] *VantagePoint Venture P'rs 1996 v. Examen, Inc.*, 871 A.2d 1108, 1112 (Del. 2005).

[82] *See VantagePoint*, 871 A.2d at 1113 ("The internal affairs doctrine applies to those matters that pertain to the relationships among or between the corporation and its officers, directors, and shareholders." (citing *McDermott Inc. v. Lewis*, 531 A.2d 206, 214 (Del. 1987))).

[83] Def.'s Opening Br. at 16–19. Defendant also argues that Alix and Alix Holdings lack standing to pursue the claim for breach of the Employment Agreement. *Id.* at 16. In response, Plaintiffs clarified that only Alix S.r.l. brings that claim. *See supra* note 28.

that the plaintiff suffered an injury in fact.[84]  An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."[85]  "At the pleading stage, general allegations of injury are sufficient to withstand a motion to dismiss because it is 'presume[d] that general allegations embrace those specific facts that are necessary to support the claim.'"[86]

Defendant argues that Alix and Alix Holdings have not suffered an injury in fact because the information Defendant downloaded belongs exclusively to Alix S.r.l.[87]  But it is a reasonable inference from the facts alleged in the Complaint that Defendant accessed the confidential and proprietary information of all three AlixPartners entities.

In the Complaint, Plaintiffs define "AlixPartners" to include Alix, Alix Holdings, and Alix S.r.l.[88]  Nothing in Plaintiffs' allegations limit the ownership of the misappropriated materials to Alix S.r.l.  They allege that the information Defendant downloaded includes "numerous PowerPoint presentations related to

---

[84] *Dover Historical Soc'y v. City of Dover Planning Comm'n*, 838 A.2d 1103, 1110 (Del. 2003).

[85] *Id.* (quoting *Soc'y Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 175–76 (3d Cir. 2000)).

[86] *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

[87] Def.'s Opening Br. at 18.

[88] Compl. at 1.

Defendant's work on behalf of AlixPartners, reports, revenue assessments, studies prepared by AlixPartners, notes from meetings, pricing analyses, and other strategic documents."[89] "[T]he majority of th[ose] documents contain confidential and sensitive AlixPartners' and AlixPartners' clients' information."[90] At the pleading stage, the Court may presume that these general allegations as to AlixPartners "embrace those specific facts that are necessary to support the claim[s]" as to Alix and Alix Holdings.[91] This inference is buttressed by the allegation that both of AlixPartners' data protection systems that detected the purported breaches are hosted within the United States—the country where Alix and Alix Holdings are organized and located.[92] Those U.S.-based data protection systems revealed that Defendant downloaded thousands of confidential documents and that a majority of the 22,000 items that Defendant copied, created, or wrote to his external storage device "appear to be AlixPartners data."[93]

Defendant cites a federal case, *Acrisure Holdings, Inc. v. Frey*,[94] to argue that the information Defendant downloaded belongs exclusively to Alix S.r.l. because

---

[89] *Id.* ¶ 38.

[90] *Id.*

[91] *Dover Historical Soc'y*, 838 A.2d at 1110 (quoting *Lujan*, 504 U.S. at 561).

[92] Compl. ¶¶ 4–5, 27, 33.

[93] *Id.* ¶¶ 2, 35–36.

[94] 2019 WL 1324943 (D. Del. Mar. 25, 2019).

Defendant was in Alix S.r.l.'s direct employ.[95]  In *Acrisure*, a subsidiary's parent and its holding company sued the subsidiary's former employee.[96]  The plaintiffs alleged that the defendant misappropriated a client list exclusively from the subsidiary as "his employer," rather than from all three entities.[97]  In addition, the employment agreement at issue in *Acrisure* stated: "All business [the defendant] develops and secures . . . and all business [he] services during the term of this Agreement shall be the *exclusive property* of [the subsidiary]."[98]  The court thus found that the plaintiffs lacked standing to pursue their misappropriation claims.[99]

  *Acrisure* is inapposite.  In this case, Plaintiffs have alleged that defendant downloaded documents that belong to all three AlixPartners entities.[100]  The Complaint contains no allegation that the allegedly misappropriated information belongs solely to Alix S.r.l.  In addition, the Employment Agreement does not contain a provision similar to that in *Acrisure* designating the information at issue as the exclusive property of Alix S.r.l.  In fact, the Employment Agreement contemplates the opposite: that Defendant would have access to the confidential

---

[95] Pls.' Answering Br. at 19.

[96] *Acrisure*, 2019 WL 1324943, at *1, 3.

[97] *Id.* at *7.

[98] *Id.* at *7 n.108 (emphasis added).

[99] *Id.* at *8–11.

[100] Compl. ¶¶ 31–32, 36–38.

information of not only Alix S.r.l. as his direct employer, but also of Alix and Alix Holdings as related entities.[101]  Thus, Defendant's argument that the data belongs solely to Alix S.r.l. is unavailing.  The Complaint adequately alleges an injury in fact such that the inference of standing as to Alix and Alix Holdings is appropriate at this stage.

### C.      The Court Has Personal Jurisdiction Over Defendant.

Defendant also moves to dismiss pursuant to Rule 12(b)(2) for lack of personal jurisdiction.[102]  Delaware courts resolve questions of personal jurisdiction using a two-step analysis.[103]  First, the court must "determine that service of process is authorized by statute."[104]  Second, the defendant must have certain minimum contacts with Delaware such that the exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice."[105]  However, "[w]hen a party is bound by a forum selection clause, the party is considered to have expressly

---

[101] The Employment Agreement prohibits Defendant from disclosing or using "any confidential or proprietary information of the Group . . . relating to the property, business and affairs of the Group."  Employment Agreement at 5.  The term "Group" includes not only Alix S.r.l. and any other subsidiary of Alix, but also "all companies controlling, controlled by or under common control within the meaning of article 2359 of the Italian Civil Code."  *Id.* at 4, 5.  This definition encompasses Alix and Alix Holdings.  Dkt. 15, Decl. of Giovanni Gaudio Pursuant to 10 *Del. C.* § 5351, *et seq.* ¶ 13 n.4.

[102] Def.'s Opening Br. at 20.

[103] *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007).

[104] *Id.*

[105] *Matthew v. Fläkt Woods Gp. SA*, 56 A.3d 1023, 1027 (Del. 2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

25

consented to personal jurisdiction."[106]  "An express consent to jurisdiction, in and of itself, satisfies the requirements of Due Process," eliminating the need to undertake a minimum contacts analysis.[107]  Forum selection clauses are "'presumptively valid' and should be 'specifically' enforced unless the resisting party 'clearly show[s] that enforcement would be unreasonable and unjust, or that the clause [is] invalid for such reasons as fraud and overreaching.'"[108]

Two agreements at issue in this case contain Delaware forum selection clauses—the LLP Agreement and the Equityholders' Agreement.[109]  On their faces, those agreements apply to claims asserted in the Complaint,[110] and Defendant does

---

[106] *Solae, LLC v. Hershey Can., Inc.*, 557 F. Supp. 2d 452, 456 (D. Del. 2008) (citing *Res. Ventures, Inc. v. Res. Mgmt. Int'l, Inc.*, 42 F. Supp. 2d 423, 431 (D. Del. 1999)).

[107] *Id.* (citing *Sternberg v. O'Neil*, 550 A.2d 1105, 1116 (Del. 1988), *abrogated on other grounds by Genuine Parts Co. v. Cepec*, 137 A.3d 123 (Del. 2016)).

[108] *Ingres Corp. v. CA, Inc.*, 8 A.3d 1143, 1146 (Del. 2010) (quoting *Capital Gp. Cos. v. Armour*, 2004 WL 2521295, at *3 (Del. Ch. Nov. 3, 2004)).

[109] LLP Agreement § 15.9 ("In any judicial proceeding involving any dispute, controversy or claim arising out of or relating to this Agreement or [Alix Holdings] or its operations, each of the Partners and [Alix Holdings] unconditionally accepts the non-exclusive jurisdiction and venue of any United States District Court located in the State of Delaware, or of the Court of Chancery of the State of Delaware . . . ."); Equityholders' Agreement § 5.8 ("In any judicial proceeding involving any dispute, controversy or claim arising out of or relating to this Agreement, each party hereto unconditionally accepts jurisdiction and venue of any United States District Court located in the State of Delaware, or of the Court of Chancery of the State of Delaware . . . .").

[110] Compl. Counts II, V, VI.

26

not contend otherwise. Defendant also does not contend that the forum selection clauses are invalid because they were the product of "fraud or overreaching."[111]

Instead, Defendant argues that the Delaware forum selection clauses are unenforceable as to him because he "merely joined the agreements" and had "no ability to negotiate their terms."[112] This argument fails to rebut the presumed validity of the forum selection clauses. Individuals often become parties to agreements by signing joinders to those agreements, as the case law Defendant cites illustrates.[113] This Court declines to hold that forum selection clauses in every such agreement are categorically invalid and unenforceable for want of free negotiation.

Further, Defendant's emphasis on the purportedly "inequitable" nature of an exercise of personal jurisdiction in this case is deeply misguided, especially in light of the equitable principles announced in the very case law on which he relies.[114] Defendant cites to *Capital Group* as support for the proposition that a "freely negotiated" agreement is one that "contemplate[s] the claimed inconvenience,"[115] but he ignores its discussion of equitable estoppel. In *Capital Group*, this Court

---

[111] *Ingres Corp.*, 8 A.3d at 1146.

[112] Def.'s Opening Br. at 22.

[113] *See Capital Gp.*, 2004 WL 2521295, at *2 (considering trustees' execution of a "Joinder Agreement" by which they agreed to be bound by a stock restriction agreement and finding that the forum selection clause in the stock restriction agreement was valid).

[114] Def.'s Opening Br. at 22 ("[I]t would be inequitable to permit Plaintiffs to manufacture personal jurisdiction via a non-negotiated jurisdictional consent provision . . . .").

[115] *Id.* at 21 (citing *Capital Gp.*, 2004 WL 2521295, at *6); Def.'s Reply Br. at 18 (same).

27

bound a non-signatory to a Delaware forum selection clause when it found that the non-signatory received a direct benefit from and was thus "closely related" to the agreement at issue.[116] The closely-related test is an application of equitable estoppel, which—as the Court in *Capital Group* explained—"prevents a non-signatory to a contract from embracing the contract, and then turning her back on the portions of the contract, such as a forum selection clause, that she finds distasteful."[117]

In this case, even if Defendant had not "joined" the LLP or Equityholders' Agreements, he received a direct benefit from those agreements in the form of partnership rights and interests in Alix Holdings.[118] In view of these rights, he is "closely related" to—and thus bound by—their forum selection provisions.[119] This Court will not allow Defendant to accept the benefits of the agreements while simultaneously escaping his obligation under those agreements to litigate in Delaware.

---

[116] *Capital Gp.*, 2004 WL 2521295 at *6–7.

[117] *Id.* at *6.

[118] LLP Agreement art. IV; Compl. Exs. D, E, F, G, H, I, at 1 ("[A]s a condition to the grant of this Option, the Participant shall . . . be required to execute the omnibus joinder . . . to the Partnership Agreement and the Equityholders' Agreement . . . .").

[119] *See Neurvana Med., LLC v. Balt USA, LLC*, 2019 WL 4464268, at *4 (Del. Ch. Sept. 18, 2019) (collecting cases finding that non-signatories were bound by the relevant agreements' forum selection clauses because they received direct benefits—"both pecuniary and non-pecuniary"—from those agreements).

28

**D.**     **Venue in This Court Is Proper, but Practical Considerations Warrant a Stay of Claims Under the Employment Agreement.**

Defendant next moves for dismissal of the entire Complaint under Rule 12(b)(3) for improper venue on *forum non conveniens* grounds.[120]  As discussed above, however, Defendant bound himself to the Delaware forum selection provisions in the LLP Agreement and Equityholders' Agreement.[121]  In so doing, Defendant "unconditionally accept[ed]" the "jurisdiction and venue" of the Delaware Court of Chancery with respect to claims arising out of those agreements.[122]  Defendant may not renege on this promise by now claiming that this Court is an inappropriate forum.

The Delaware Supreme Court's decision in *Ingres* is instructive.  That case involved a forum selection clause designating either Delaware or New York as the appropriate forum.[123]  The Supreme Court affirmed this Court's refusal to stay the Delaware action in favor of a first-filed California action under *McWane* in light of the parties' "agreed upon forum selection clauses."[124]  The *Ingres* Court then

---

[120] Def.'s Opening Br. at 24–30.

[121] LLP Agreement § 15.9; Equityholders' Agreement § 5.8.

[122] LLP Agreement § 15.9; Equityholders' Agreement § 5.8.

[123] *Ingres*, 8 A.3d at 1145 & n.1.

[124] *Id.* at 1145.  "In *McWane*, [the Delaware Supreme Court] held that Delaware courts should exercise discretion in favor of a stay where a prior action, involving the same parties and issues, is pending elsewhere in a court capable of doing prompt and complete justice." *Id.* (citing *McWane Cast Iron Pipe Corp. v. McDowell–Wellman Eng'g Co.*, 263 A.2d 281 (Del. 1970)).

29

clarified that, "where contracting parties have expressly agreed upon a legally enforceable forum selection clause, a court should honor the parties' contract and enforce the clause, even if, absent any forum selection clause, the *McWane* principle might otherwise require a different result."[125]  This was so because "the *McWane* principle is a default rule of common law, which the parties to the litigation are free to displace by a valid contractual agreement."[126]

Like the *McWane* doctrine, the *forum non conveniens* doctrine is a rule of common law that parties are free to displace by a valid contractual agreement.  The plain language of the forum selection clauses in the LLP Agreement and Equityholders' Agreement preclude Defendant's *forum non conveniens* argument as a basis for dismissal.[127]

---

[125] *Id.*

[126] *Id.* at 1146.

[127] Defendant alternatively suggests that principles of international comity warrant deference to the Italian courts.  Def.'s Opening Br. at 15 n.16; Def.'s Reply Br. at 11–14. "International comity is an 'abstention doctrine,' under which a court that has jurisdiction over a person or dispute . . . *may* abstain from exercising jurisdiction and defer to a foreign court." *Nat'l Indus. Gp. (Hldg.) v. Carlyle Inv. Mgmt. L.L.C.*, 67 A.3d 373, 387 (Del. 2013) (quoting *Ungaro–Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1237 (11th Cir. 2004)). But "[t]he enforcement of an international forum selection clause is not an issue of comity." *Id.*  Rather, "[i]t is a matter of contract enforcement and giving effect to substantive rights that the parties have agreed upon." *Id.*  The Delaware forum selection clauses in the LLP Agreement and Equityholders' Agreement thus "supersede[]" the "application of the doctrine of international comity," just as they supersede Defendant's *forum non conveniens* argument. *Id.*

30

The same cannot be said of the claims arising exclusively from the Employment Agreement—Count I for breach of the Employment Agreement's confidentiality, Return of Property, and Best Efforts provisions, and the portion of Count VI seeking relief under the non-solicitation provision in the Employment Agreement. Unlike the LLP Agreement and Equityholders' Agreement, the Employment Agreement does not contain a Delaware forum selection provision. As a result, Defendant's *forum non conveniens* argument is not foreclosed with respect to the claims arising exclusively out of the Employment Agreement.

Under the doctrine of *forum non conveniens*, a court may decline to hear a case "whenever considerations of convenience, expense, and the interests of justice dictate that litigation in the forum selected by the plaintiffs would be unduly inconvenient, expensive or otherwise inappropriate."[128] The doctrine operates even "[w]here there is no issue of prior pendency of the same action in another jurisdiction."[129] Delaware courts consider six factors when determining whether an action should be dismissed on *forum non conveniens* grounds:

> (1) the relative ease of access to proof; (2) the availability of compulsory process for witnesses; (3) the possibility of the view of the premises; (4) whether the controversy is dependent on the application of Delaware law which the

---

[128] *Summer Sports, Inc. v. Remington Arms Co.*, 1993 WL 67202, at *7 (Del. Ch. Mar. 4, 1993) (quoting *Monsanto Co. v. Aetna Cas. & Sur. Co.*, 559 A.2d 1301, 1304 (Del. Super. Ct. 1988)).

[129] *Martinez*, 86 A.3d at 1104 (citing *Taylor v. LSI Logic Corp.*, 689 A.2d 1196, 198–99 (Del. 1997)).

courts of this State more properly should decide than those of another jurisdiction; (5) the pendency or nonpendency of a similar action or actions in another jurisdiction; and (6) all other practical problems that would make the trial of the case easy, expeditious and inexpensive.[130]

To obtain dismissal of a first-filed or only-filed action in Delaware, "[t]he defendant must show 'with particularity' that one or more of these factors . . . imposes an 'overwhelming hardship' on the defendant."[131]  Unlike dismissal, a stay of proceedings under the doctrine of *forum non conveniens* does not require a showing of "overwhelming hardship"—rather, "the burden . . . is a lesser one."[132]  "Given the profound distinction between those two remedies, that is hardly surprising."[133]  Thus, when considering whether to stay proceedings under the doctrine of *forum non conveniens*, the defendant need only show that, "on balance," the relevant factors "preponderate in favor of granting a stay."[134]

---

[130] *Id.* (citing *Gen. Foods Corp. v. Cryo-Maid, Inc.*, 198 A.2d 681, 684 (Del. 1964)).

[131] *Mar-Land Indus. Contractors, Inc. v. Caribbean Petroleum Ref., L.P.*, 777 A.2d 774, 778 (Del. 2001) (quoting *Ison v. E.I. du Pont de Nemours & Co.*, 729 A.2d 832, 838 (Del. 1999)); *see Lisa, S.A. v. Mayorga*, 993 A.2d 1042, 1047 (Del. 2010) ("overwhelming hardship" standard only applies where "the Delaware action [is] either the first filed or the only filed action").

[132] *HFTP Invs., L.L.C. v. ARIAD Pharm., Inc.*, 752 A.2d 115, 121 (Del. Ch. 1999) (quoting *Life Assurance Co. of Penn. v. Associated Inv'rs Int'l Corp.*, 312 A.2d 337, 340 (Del. Ch. 1973)).

[133] *Id.*

[134] *Id.*

Defendant has sufficiently demonstrated that, on balance, the relevant factors warrant a stay of Count I and the portion of Count VI pertaining to the non-solicitation provision in the Employment Agreement. The Employment Agreement contains an Italian choice of law provision and is thus governed by Italian law.[135] The underlying facts of this case may ultimately involve a "right of defense" that is peculiar to the Italian legal regime and thus more properly litigated in an Italian court.[136] They may also involve a determination of whether the non-solicitation provision in the Employment Agreement is subject to certain restrictive covenant requirements or to general principles of freedom of contract.[137]

In the same vein, trial in Italy as to claims under the Employment Agreement might very well be easier, more expeditious, and less expensive. Defendant's tenure with AlixPartners took place in Italy, and the witnesses who may have information about his termination from that tenure are located in Italy. Those witnesses might

---

[135] Employment Agreement at 8 ("This agreement and its performance will be construed and interpreted in accordance with the laws of Italy."). "Delaware courts will recognize a choice of law provision if the jurisdiction selected bears some material relationship to the transaction." *Annan v. Wilm. Tr. Co.*, 559 A.2d 1289, 1293 (Del. 1989) (citing *Wilm. Tr. Co. v. Wilm. Tr. Co.*, 24 A.2d 309, 315 (1942)). Italy bears some material relationship to Defendant's employment because his direct employer is an Italian entity located in Italy and because his tenure took place entirely in Italy.

[136] Def.'s Opening Br. at 35–37. For a discussion of the "right of defense," *see infra* note 147 and accompanying text.

[137] Def.'s Opening Br. at 39; Pls.' Answering Br. at 49–50.

not be subject to compulsory process, thus disabling the Court from compelling their appearance in Delaware.

Taken collectively, while these facts may not demonstrate an "overwhelming hardship" to Defendant sufficient to warrant dismissal of any claims, the Court is satisfied that they satisfy the lesser burden of a stay. Thus, Count I and the portion of Count VI pertaining to the non-solicitation provisions in the Employment Agreement are stayed.[138]

### E.   Plaintiffs Have Sufficiently Stated Their Claims.

Defendant moves to dismiss Counts II, III, IV, and VI for failure to state a claim.[139] Under Rule 12(b)(6), the Court may grant a motion to dismiss for failure to state a claim if a complaint does not allege facts that, if proven, would entitle the plaintiff to relief.[140] "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[141] When considering such a motion, the Court must "accept all well-pleaded factual allegations in the

---

[138] It might be appropriate to stay aspects of Count V, which Defendant describes as "interwoven" with Plaintiffs' claims under the Employment Agreement. Def.'s Opening Br. at 37. As instructed in the conclusion of this decision, the parties shall confer to determine whether there is a way to stay proceedings in Delaware or in Italy to avoid having both courts determine overlapping issues.

[139] Def.'s Opening Br. at 31–43. Defendant also moved to dismiss Count I for failure to state a claim, but for the reasons detailed above, that Count is stayed.

[140] Ct. Ch. R. 12(b)(6).

[141] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[c]omplaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[142]   The reasonable conceivability standard asks whether there is a possibility of recovery.[143]  The Court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[144]

Defendant first argues that this Court should dismiss Counts II, III, and IV because the relevant choice of law provisions are unenforceable in light of Italian public policy.  He further argues that Count VI should be dismissed because the non-solicitation provisions in the Employment Agreement and various option award agreements are unenforceable under Italian and Delaware law.

### 1. Claims for Breach of Contractual Confidentiality Obligations, Misappropriation, and Conversion

Defendant argues that the Delaware choice of law provisions in the LLP Agreement and Equityholders' Agreement are unenforceable and that Italian law applies to Plaintiffs' claims for breach of his contractual confidentiality obligations, misappropriation, and conversion.[145]  Defendant submits a declaration in support of

---

[142] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[143] *Id.* at 537 n.13.

[144] *Price v. E.I. du Pont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[145] Def.'s Opening Br. at 31–34.

this argument, stating that he in fact "downloaded . . . data in order to preserve [his] right of defense, guaranteed by the Italian Constitution and several pronouncements of the Italian Supreme Court."[146]  That constitutional "right of defense," according to Defendant, allows employees to retain information concerning the employment relationship for use in an employment action as a form of self-help discovery.[147] Defendant argues that this Italian "right of defense" supersedes his contractual confidentiality obligations, and that as a result, Plaintiffs' claims fail as a matter of law.[148]

At this stage, the Court need not reach the question of whether Italian substantive law governs Plaintiffs' claims because the Complaint adequately states a claim even if Italian law governs and operates as Defendant describes.  "As a general rule, the law of the forum governs procedural matters."[149]  Under Delaware law, "[t]he complaint generally defines the universe of facts that the trial court may

---

[146] Dkt. 9, Decl. of Giacomo Mori Pursuant to 10 *Del. C.* § 3927 ¶ 7.

[147] Def.'s Opening Br. at 35–37.  According to Defendant, Article 414 requires plaintiffs bringing employment actions to prove their facts at the outset of their case without the benefit of discovery.  Failla Decl. ¶ 18; *see supra* note 39.  Defendant's expert explains that this burden of proof has led Italian courts to interpret Article 24 of the Italian Constitution as affording Italian employees the substantive right to "take and retain documents and information concerning the employer and/or employment relationship for the purpose of asserting a legal defense or challenge to an employment action."  *Id.* ¶ 16.

[148] *Id.* at 36–37.

[149] *Chaplake Hldgs., LTD v. Chrysler Corp.*, 766 A.2d 1, 5 (Del. 2001) (citations omitted).

36

consider in ruling on a 12(b)(6) motion to dismiss."[150] "Matters extrinsic to a complaint generally may not be considered in a ruling on a motion to dismiss."[151] In this case, the Complaint does not allege that Defendant's intent in downloading the information was to launch a legal challenge to his termination in Italy. Rather, it alleges that he "misappropriated AlixPartners' trade secrets and other confidential and proprietary information for his own benefit."[152] On a motion to dismiss, this Court may not venture beyond the pleadings and consider facts Defendant offers through an affidavit in his own defense.[153] This aspect of Defendant's motion is therefore denied.

### 2. Claims as to the Non-Solicitation Provisions in the February 2017, April 2017, and April 2018 Agreements

Count VI of the Complaint seeks declarations concerning Defendant's obligations under the non-solicitation provisions of the Award Agreements,[154] which

---

[150] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) (collecting cases).

[151] *Gentili v. L.O.M. Med. Int'l, Inc.*, 2012 WL 3552685, at *2 (Del. Ch. Aug. 17, 2012) (quoting *Zucker v. Andreessen*, 2012 WL 2366448, at *2 (Del. Ch. June 21, 2012)).

[152] Compl. ¶ 25.

[153] *See Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 96 n.2 (Del. 2013) ("Generally, a judge should not consider matters outside of the pleadings when he rules on a Court of Chancery Rule 12(b)(6) motion." (citing *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMP Managers, Inc.*, 691 A.2d 609, 612 (Del. 1996))).

[154] The portion of Count VI seeking declaratory judgment as to the non-solicitation provisions in the Employment Agreement is stayed on *forum non conveniens* grounds, as previously discussed.

prevent Defendant from "directly or indirectly engag[ing] in the solicitation of any business from, or attempt[ing] to influence, any of the Group's clients, prospective clients, or Lead Sources . . . ."[155]  Plaintiffs specifically ask the Court to "[d]eclare that, during the non-solicitation periods applicable to each of his non-solicitation obligations to AlixPartners, Defendant may not be employed by or perform services for any client, prospective client, or Lead Source of [Alix Holdings] or any of its affiliates or subsidiaries."[156]

In support of dismissal, Defendant first argues that the plain language of the non-solicitation provisions do not support the declaration Plaintiffs seek, which would restrict Defendant's ability to work for certain employers.  Defendant interprets the non-solicitation provisions as restricting Defendant's ability to solicit business only from AlixPartners clients, prospective clients, or lead sources.[157]  In contrast, Plaintiffs interpret the non-solicitation provisions more broadly to prohibit Defendant from being employed by or performing services for an AlixPartners client, prospective client, or lead source.  Plaintiffs reason that by virtue of such employment, Defendant would necessarily "attempt to influence" the relevant actor, including with respect to any engagement that actor has with AlixPartners.[158]

---

[155] Compl. ¶ 101; *id.* Exs. D, E, F, G, H, I §§ 8(b).

[156] Compl. Prayer for Relief ¶ k; Def.'s Opening Br. at 38–43.

[157] Def.'s Opening Br. at 41–42.

[158] Pls.' Answering Br. at 54.

"When interpreting a contract, the role of a court is to effectuate the parties' intent."[159] "Absent ambiguity, the court 'will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions.'"[160] Ambiguity arises when a contractual term is "fairly or reasonably susceptible to more than one meaning."[161] If a term is ambiguous, dismissal under Rule 12(b)(6) is improper unless "the defendant['s] interpretation is the *only* reasonable construction as a matter of law."[162] At this stage, "the trial court cannot choose between two differing reasonable interpretations of ambiguous provisions."[163]

In this case, the "attempt to influence" language of the non-solicitation provisions is reasonably susceptible to more than one meaning. On the one hand, it is at least reasonably conceivable that the phrase "attempt to influence" prohibits only affirmative attempts to influence certain persons such that merely being in the employment of a client, prospective client, or lead source is permissible. On the other hand, the prohibition on any "attempt to influence" could be construed as broad

---

[159] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[160] *Williams Field Servs. Gp., LLC v. Caiman Energy II, LLC*, 2019 WL 4668350, at *16 (Del. Ch. Sept. 25, 2019) (quoting *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016)).

[161] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

[162] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003) (citing *Vanderbilt Income*, 691 A.2d at 613).

[163] *Id.* (citing *Vanderbilt Income*, 691 A.2d at 613).

enough to prohibit working or performing services for a client, prospective client, or lead source. Because the relevant language is susceptible to multiple reasonable interpretations, it is ambiguous.[164] At the pleading stage, the Court must construe it "in the light most favorable to the non-moving party."[165] Thus, the Court declines to dismiss Count VI on the ground that it seeks relief impermissible under the non-solicitation provisions in the Award Agreements.

Defendant next argues that the non-solicitation provisions in the Award Agreements are unenforceable under Delaware law because of their open-ended temporal scope.[166] As Defendant observes, the Award Agreements impose non-solicitation obligations while his equity remains outstanding and for two years thereafter, but the Equityholders' Agreement gives Alix Holdings "the right, but not

---

[164] *Id.* (citing *Vanderbilt Income*, 691 A.2d at 613).

[165] *Id.* (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894 (Del. 2002); *McMullin v. Beran*, 765 A.2d 910, 916 (Del. 2000)).

[166] Def.'s Opening Br. at 42–43. The Equityholders' Agreement and 2017 Plan, which Plaintiffs allege govern the various Award Agreements, both contain Delaware choice of law provisions. *See supra* notes 6 & 8 and accompanying text; *see also* Equityholders' Agreement § 5.7 ("This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware."); 2017 Plan § 13(a) ("This Plan and the Awards granted hereunder shall be governed by and construed in accordance with the law of the State of Delaware, without regard to conflicts of laws principles thereof."). And again, "Delaware courts will recognize a choice of law provision if the jurisdiction selected bears some material relationship to the transaction." *Annan*, 559 A.2d at 1293 (citing *Wilm. Tr. Co.*, 24 A.2d at 315). Delaware bears some material relationship to the Award Agreements, as those agreements govern awards of equity in a Delaware entity—Alix Holdings. Defendant's argument that Italian law should apply thus fails.

40

the obligation," to repurchase those equity interests.[167]  Thus, the argument goes, Defendant's non-solicitation obligation would extend until Alix Holdings exercises its right to repurchase his equity—which could potentially be never.[168]

Defendant's argument fails, at least with respect to the February 2017, April 2017, and April 2018 Agreements.  The 2017 Plan arguably governs those agreements.[169]  Under the 2017 Plan, Defendant's options under the February 2017, April 2017, and April 2018 Agreements stopped vesting and were subject to reacquisition automatically upon Defendant's termination.[170]  Thus, the two-year clock on Defendant's non-solicitation obligations under those agreements immediately began ticking as of the date he was terminated.

Defendant's argument is more persuasive with respect to the 2014 and 2016 Agreements, which are not subject to the 2017 Plan's automatic reacquisition or termination provisions and are thus arguably open-ended.[171]  Defendant, however,

---

[167] Def.'s Opening Br. at 42–43; *see* Equityholders' Agreement §§ 4.1(a), (b), (c).

[168] Def.'s Opening Br. at 42–43.

[169] *See supra* note 8.

[170] Compl. ¶ 59; 2017 Plan § 5(e) ("[I]n the event of a Participant's termination of Employment for any reason prior to the time that such Participant's LLP Interests have vested, all vesting with respect to such Participant's LLP Interests shall cease, and all unvested LLP Interests shall be reacquired by the Partnership . . . .").

[171] Plaintiffs read Section 4.1(c) of the Equityholders' Agreement as requiring Alix Holdings to exercise its right to repurchase Defendant's equity under the 2014 and 2016 Agreements within two years of his termination. Pls.' Answering Br. at 57. This, Plaintiffs argue, sets a four-year duration for the non-solicitation provisions in the 2014 and 2016 Agreements.  However, the Equityholders' Agreement provides Alix Holdings a

41

fails to point to legal authority for the proposition that the arguably open-ended nature of those provisions renders them wholly unenforceable as a matter of law.[172] This aspect of Defendant's motion is therefore denied.

## III. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is DENIED. Count I and the portion of Count VI pertaining to the non-solicitation provisions in the Employment Agreement are STAYED.

As the dust settles from this decision, it becomes clear that there is significant overlap between the stayed claims, which will presumably move forward in Italy at some point, and aspects of the sustained claims pending in this Court. The parties shall confer to determine whether there is a practical way to stage proceedings in a manner that promotes efficiency in both fora. Within twenty days of the entry of

---

repurchase *right*, not a repurchase *obligation*. And this right includes the right to repurchase only *some*—and not all—of Defendant's equity. Ultimately, the Equityholders' Agreement provides no requirement that Alix Holdings or any of its stakeholders repurchase Defendant's vested interests in the partnership. While Section 4.1(g) of the Equityholders' Agreement provides a process whereby other partners may repurchase Defendant's equity in the event Alix Holdings chooses not to, that process is also optional. The effect of this contractual scheme is that the non-solicitation provisions in the 2014 and 2016 Agreements are potentially infinite in duration.

[172] Defendant cites to no Delaware authority rendering non-solicitation provisions unenforceable on this basis, which does not mean that none exists; Defendant might be able to support its argument as a matter of law at a later stage. In any event, the issue is largely academic, given that the non-solicitation issues to be litigated in connection with the February 2017, April 2017, and April 2018 Agreements overlap with those to be litigated under the 2014 and 2016 Agreements.

42

this decision, the parties shall jointly submit a stipulation reflecting any agreement that arises from this meet and confer or jointly submit a letter reflecting their competing positions. If the parties are unable to agree upon a mode of staging the potentially competing cases so as to avoid a collision course, the Court reserves the right to revisit the balancing analysis called for by the *forum non conveniens* doctrine, including the scope of the discretionary stay granted by this decision.